# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS NORWOOD, | 1:07cv01287 DLB |
| Plaintiff, | ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| v. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

## **BACKGROUND**

Plaintiff Douglas Norwood ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On October 24, 2007, the Honorable Anthony W. Ishii reassigned the case to the undersigned for all purposes.

1

# FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed his application for supplemental security income on February 11, 2004, alleging disability since February 22, 1995, due to pain, hypertension, swelling in his feet and problems concentrating. AR 65-69, 104-113. After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 41-45, 47-52, 53. On January 29, 2007, ALJ Eve Godfrey held a hearing. AR 273-309. She denied benefits on April 27, 2007. AR 11-22. On July 21, 2007, the Appeals Council denied review. AR 3-5.

Hearing Testimony

ALJ Godfrey held a hearing on January 29, 2007, via video conference. Plaintiff appeared with his attorney, Geoffrey Hayden. Medical Expert Michael Goldhamer and Vocational Expert ("VE") Gloria Lasoff also appeared and testified. AR 273.

Plaintiff testified that he was 52 years old at the time of the hearing and completed about 15 years of education. AR 280. He last worked as a floor hand on an oil rig, but has not worked for the past 15 years after getting hurt on the job in 1995. AR 281-282. He lives with his two children, ages 13 and 14, and his girlfriend. AR 283.

During the day, he sleeps a lot because of his medication. He also watches television and tries to move around a little for exercise. He walks for two or three minutes and can only sit for about 40 to 50 minutes before he's in pain. AR 283. He cannot stand for long. AR 284. He has a driver's license and can drive when he's not on medication. AR 284.

Plaintiff testified that he has diabetes for which he tries to follow a certain diet, takes medication and tests his blood twice daily. AR 285-286. He further testified that he last used cocaine in 1986, and that he did not remember a diagnosis of cocaine-induced mood disorder in 2004. AR 286-287. He drinks occasionally and smokes a pack of cigarettes a day. AR 287.

Plaintiff felt that he could not work because he doesn't concentrate well and has pain in his lower back and arms. AR 287. He also gets tired fast. AR 287. He described the pain in his

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

back as a stiffness, after which his back "goes out." AR 288. The pain in his arms is sharp and shooting, and his arms sometimes get numb. AR 288. The medication he takes for his arm pain causes headaches and makes him nauseous. He also has trouble getting around on his foot since the gunshot wound. Plaintiff explained that he can't wear a normal pair of shoes for over two or three hours. AR 289. He also cited the warnings on his medications relating to operating machinery and driving and said that he would "hate to hurt someone else on my account." AR 290.

When questioned by his attorney, Plaintiff testified that he had four hernia surgeries in the past and that he still cannot lift "too much." AR 290. The gunshot wound occurred as he was exiting a convenience store and a passing car started shooting. AR 291.

Plaintiff also explained that he has heart trouble and can't see as well as he used to. AR 291. Plaintiff estimated that his pain was about an eight on a scale of one to ten. AR 292. On a normal day, he gets the kids up and off to school, tries to clean up a little or do something for himself and then pretty much watches television. He used to walk with crutches but doesn't anymore. AR 292. He has numbness in his hands and feet, and thought he could stand for an hour, at most, without pain. AR 293. He could not lift more than five pounds and could not kneel, stoop or squat without pain. AR 293.

Plaintiff was hospitalized in 2004 for psychological problems. AR 293. He was initially prescribed Haldol, but now takes another medication that helps. He still has trouble concentrating. AR 294. He sometimes hears "stuff" and gets paranoid. AR 294-295.

Dr. Goldhamer testified as a Medical Expert ("ME"). He explained that Plaintiff suffers from type II diabetes, a history of hypertension, a history of elevated lipids and multiple ventral hernia repairs. AR 296. He explained that Plaintiff's lipid-level was reasonably well controlled with medication. A ventral hernia would limit a person's ability to lift or do anything that would strain the muscle. Plaintiff's diabetes is under reasonable control if he takes his medications, follows his diet and exercises. Given these impairments, Dr. Goldhamer believed that Plaintiff could occasionally lift over 10 pounds. AR 297. Although most people do fine after hernia surgery, Dr. Goldhamer though that Plaintiff was part of a small percentage who have a

continued weak spot based on his repeated surgeries. AR 298. Dr. Goldhamer did not have the exact dates of Plaintiff's hernia repairs, and he read the medical reports for all surgeries during a break in testimony. AR 300. He then explained that his thinking "changes quite a bit" because the last operation was in April 1998, and since that time, Plaintiff has had no further problems. AR 303. Since it appears that the 1998 operation corrected the problem, Dr. Goldhamer believed that Plaintiff could occasionally lift 20 pounds, 10 pounds frequently. That the surgeries were all on the same site did not change his opinion. AR 308. He did not believe any further limitations were necessary and did not see a basis for limiting bending, stooping or crouching. AR 303.

Turning to the VE, the ALJ asked her to assume a person with the ability to perform light work, with a limitation to simple, repetitive tasks. This person could perform the positions of machine packer, production worker and sorter. AR 304-305.

For the second hypothetical, the ALJ asked the VE to assume a person who could occasionally bend, stoop or crouch, lift 20 pounds occasionally and 10 pounds frequently, and stand and walk six out of eight hours. This person could not work on ladders or an incline plane. The VE testified that this person could perform the light jobs already identified. AR 305. Such jobs involved fairly limited contact with the public and supervisors. AR 306.

Plaintiff's attorney asked the VE to add a limitation of moderate pain that would preclude the full amount of light work for at least one third of the day. AR 307. The VE testified that there would be no jobs available. AR 307. Her testimony was consistent with the Dictionary of Occupational Titles. AR 308.

Medical Record

In February 2003, Plaintiff reported that he was not feeling well. Testing revealed random glucose hyperglycemia and he was diagnosed with diabetes mellitus. He was given medication and instructed on the importance of control. AR 157.

Records from March 2003 indicate that his diabetes was out of control and his medications were increased. AR 161. Plaintiff's diabetes control improved in April 2003, but by May, it was under "variable control" due to noncompliance. AR 163-164. He was also

diagnosed with hyperlipidemia. AR 165. He was instructed to have testing done, continue his medication, and follow an appropriate diet. AR 165.

In June 2003, Plaintiff complained of increased shortness of breath, occasional flutters of his heart and increased pain in his right elbow and forearm, with weakness. X-rays of his left shoulder and right elbow and upper arm were negative. AR 170. His diabetes and hyperlipidemia were much improved and his right elbow/arm pain was probably secondary to tendinitis. He was prescribed Motrin, 800 mg, as needed. There was also a slight protrusion to his right mid abdomen, and given his history of abdominal hernia, a surgical consult might be necessary. AR 168-169.

Plaintiff underwent an exercise tolerance evaluation on June 11, 2003. He did not experience chest pain and his test was normal, but suboptimal. Although he tolerated the procedure well, he had limited exercise tolerance. AR 172.

On September 30, 2003, Plaintiff's diabetes, hypertension and hyperlipidemia were controlled. He had possible neuropathy secondary to diabetes or alternative etiologies (based on industrial exposure to asbestos). AR 174.

In October 2003, Plaintiff complained of low blood sugars, vision blurring and numbness and tingling in his feet. AR 176. An EMG was positive for underlying peripheral neuropathy, but negative for acute or chronic lumbar radiculopathy. AR 177.

On March 18, 2004, Plaintiff presented to Kern County Mental Health. His main complaint was hearing voices and an inability to sleep. He reported that he took Haldol previously, but it made him feel like he was losing control. Plaintiff was very evasive and guarded, and the treating source thought that past incidents of being out of control might have been due to marijuana and cocaine use. He did not appear to be disabled because of mental illness, and the treating source thought that he may be attempting to "punch up his claim with mental illness treatment." AR 200. He was diagnosed with cocaine-induced mood disorder, cannabis/cocaine induced psychotic disorder, and antisocial personality disorder. AR 201.

Plaintiff suffered a gunshot wound to his left first toe on March 19, 2004. He began treatment with podiatrist Jim Malone on March 22, 2004. X-rays showed a shattering of the proximal phalanx in the left first toe with a dorsal, lateral and medial wound. AR 203-204.

On April 1, 2004, the swelling was down and the wound size was smaller. Healing was noted, but there were also signs on acute infection in his left toe. AR 208. On April 12, 2004, the toe was still grossly swollen and there was some superficial necrosis. The wound was debrided. AR 210-211.

On April 26, 2004, podiatrist Robert Kleiman noted that the wound was no longer necrotic along the edges and had improved. AR 218.

An EKG performed on April 27, 2004, was borderline abnormal. AR 186.

On June 5, 2004, Plaintiff reported that his toe was better. There was a marked reduction in swelling and the ulcers appeared to be healed. Dr. Malone told Plaintiff that he could return to regular shoes, as tolerated, in a week and a half. AR 225.

In a form dated July 1, 2004, Dr. Malone indicated that Plaintiff's condition was expected to last until March 2005 and he could not work. He could stand/walk for up to two hours at a time, for two hours total, and could sit for up to two hours at a time, for up to two hours total. He was prohibited from using his feet for repetitive movement because he could not bend his first toe. He could lift 10 pounds occasionally and could never climb, balance, stoop, kneel, crouch or crawl. AR 226-228.

On July 9, 2004, Plaintiff returned to Dr. Malone. He complained of left hallux pain upon ambulation with shoe-gear and prolonged standing. There was significant swelling, especially at the entrance and exit site, with healing in progress. Passive range of motion was within normal limits and there was pain upon active range of motion. X-rays revealed shortening of the proximal phalanx of the hallux with healing multiple fragments and shortening and widening of the bone. Multiple rough fragments were noted. Dr. Malone discussed surgery but Plaintiff indicated that he would like to continue conservative treatment. He was instructed to continue ambulation with accommodative shoe-gear, as tolerated. AR 230.

1    Plaintiff returned to Dr. Malone on August 11, 2004.  He complained of some discomfort
2 in the first interspace but reported that he could move his toe well without any problems,
3 although it bothered him on and off and could be quite painful.  His toe was almost normal in
4 size.  Dr. Malone assessed possible nerve damage and instructed Plaintiff to take Celebrex for
5 inflammation and pain.  AR 232.
6    On October 13, 2004, Plaintiff saw Emanuel Dozier, M.D., for a consultive examination.
7 He complained of diabetes, recurring abdominal ventral hernia and right arm neuropathy.
8 Plaintiff reported that used medical marijuana.  Plaintiff ambulated with no signs of pain, ataxia
9 or shortness of breath.  He walked with a normal steppage gait and was able to sit during the
10 interview without pain.  He could transfer on and off the examination table without assistance.
11 On examination, his abdomen was soft and nondistended but there was mild local tenderness
12 along a midline abdominal scar with two nodular hernias identified at the bottom of the suture
13 line.  He had normal muscle bulk and tone in his back and there were no paravertebral spasms.
14 Bilateral straight leg raising was positive in the supine position, but negative in the sitting
15 position with no sign of atrophy.  His extremities were normal, as was his gait and coordination.
16 There was no evidence of objective numbness or localized tenderness in the right upper
17 extremity and no atrophy was noted.  Motor and grip strength were 5/5 bilaterally.  His sensory
18 examination was normal.  AR 238-242.
19    Dr. Dozier diagnosed a history of right upper extremity sensory neuropathy with history
20 of type II diabetes with diabetic neuropathy and recurrent ventral hernias.  Dr. Dozier indicated
21 that Plaintiff would have postural restrictions on frequent bending, stooping and crouching due to
22 chronic low back pain.  He would also have restrictions on climbing ladders and working on
23 inclined planes.  Plaintiff could occasionally lift 20 pounds, 10 pounds frequently.  He could
24 stand and/or walk for six hours and sit for six hours.  AR 242.
25    On October 16, 2004, Plaintiff saw Akira Suzuki, Ph.D., for a psychological evaluation.
26 When he first appeared for his appointment, Plaintiff was able to present his living situation and
27 past history "in a cogent fashion" and came across as "rational, coherent and sensible."  During
28 mental status examination, his behavior suddenly became incoherent and random.  For example,

when asked to name the current president, he answered, "Eisenhower" and named the current governor of California as "Cheney." Dr. Suzuki questioned the validity of the test results because he presented himself as suspiciously more limited than he actually was, "clearly prevaricating his performance and exaggerating his functional limits." AR 243-244.

Plaintiff reported that he was paranoid of the television and had nightmares that demons were coming after him. He reported that he was drug-free for the past 25 years. On mental status examination, he provided suspect answers immediately. He indicated that he did not know where he lived and eventually gave an incorrect address. He incorrectly spelled "cat" and "dog" despite reporting some college education. Other answers were suspiciously incorrect and random. He reported that John F. Kennedy was a "basketball player" and that Martin Luther King, Jr. was a racist. Plaintiff reported that he heard voices every day, describing them as "a lot of suicidal stuff." He was able to sustain concentration and attention for a reasonable period of time. AR 246-247.

In the presence of secondary gain of disability benefits, the rule-out diagnosis of malingering was suggested, as well as rule out cocaine and cannabis dependence and rule out schizophrenia, paranoid type, continuous. AR 250. Plaintiff presented with moderate restrictions of daily activities in the form of a lack of motivation. He had no apparent difficulty in maintaining social functioning and relating and interacting with others, and was able to maintain concentration for a reasonable period of time. He could clearly understand, remember and carry out simple instructions. He appeared to be mildly limited in his persistence and pace, however, and based on his past substance abuse, Dr. Suzuki recommended that his funds be handled by a third party. Dr. Suzuki thought that Plaintiff could benefit from substance abuse counseling and ongoing participation in AA or NA. He could also benefit from vocational rehabilitation, and psychiatric treatment and psychotropic medication may be helpful to keep him asymptomatic. AR 251.

On November 17, 2004, State Agency physician Lavanya Bobba, M.D., completed a Physical Residual Functional Capacity Assessment. Dr. Bobba opined that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk for about six hours and sit for

1  about six hours.  He could frequently climb, balance, kneel, crouch and crawl, and could
2  occasionally stoop.  AR 252-259.
3        On November 19, 2004, State Agency physician Archimedes Garcia, M.D., opined that
4  there was insufficient evidence of a psychiatric impairment because of evidence that Plaintiff was
5  malingering.  AR 263, 265.
6        On October 4, 2006, Jacqueline E. Paul-Gordon, M.D., completed a form indicating that
7  Plaintiff could not work.  He could stand/walk for up to two hours at a time, for two hours total,
8  because of left ventricular enlargement, coronary artery disease, degenerative disease of the
9  cervical spine and A/C joints and dyspnea with fairly mild exertion.  He could sit for up to two
10 hours at a time, for up to two hours total.  He was restricted in using his hands/fingers and feet
11 for repetitive movement and had environmental restrictions because of his diabetes.  He could
12 never lift 20 pounds and could occasionally lift 10 to 15 pounds.  He could occasionally climb,
13 constantly balance and never stoop, kneel, crouch or crawl.  He could occasionally reach below
14 his knees and could never reach waist to chest, chest to shoulders or above his shoulders.  Dr.
15 Paul-Gordon also indicated that Plaintiff was on anti-psychotic medication.  AR 267-269.
16       In a document dated July 18, 2006, William F. Baker, M.D., listed diagnoses of persistent
17 ventral hernia, chronic, uncontrolled abdominal pain, uncontrolled diabetes and acute lumbar
18 sprain and strain.  Plaintiff was ordered to follow up and referred for a CT scan.  AR 270.
19       Plaintiff also submitted a one-page January 30, 2007, Physical Capacities Evaluation
20 completed by Dr. Paul-Gordon.  She opined that Plaintiff could continuously sit for one to two
21 hours, for a total of two hours a day, and could continuously walk or stand for one hour or less,
22 for a total of one to two hours.  He had to change positions often and lie down periodically
23 throughout the day to relieve pain.  He could lift and carry 10 to 15 pounds occasionally.
24 Plaintiff could not sit upright for prolonged periods with his head in a fixed position.  His pain
25 was moderate, although marked at times.  AR 272.
26
27
28

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of diabetes mellitus and status post four ventral hernia surgeries. AR 16. He retained the residual functional capacity ("RFC") to perform light exertional work with a limitation to simple, repetitive tasks. AR 17. Based on the testimony of the VE, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. AR 21-22.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f). Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of his disability; (2) has an impairment or a combination of impairments that is considered "severe" (diabetes mellitus and status post four ventral hernia surgeries) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) is unable to perform his past relevant work; but (5) retains the RFC to perform a significant number of jobs in the national economy. AR 16-22.

Here, Plaintiff argues that the ALJ erred (1) in rejecting the original testimony of the ME; (2) in rejecting Dr. Paul-Gordon's limitations; and (3) in finding his foot impairment non-severe.

**DISCUSSION**

A.   Testimony of the ME

Plaintiff first argues that the ALJ erred in rejecting the "original testimony" of Dr. Goldhamer that he should not lift more than 10 pounds. Plaintiff bases his argument on his belief that the ALJ incorrectly determined that his hernia problems had resolved and cites new records submitted to the ALJ.

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987). At least where the treating doctor's opinion is not contradicted by another

doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir.1991). Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. *Pitzer*, 908 F.2d at 506 n. 4; *Gallant*, 753 F.2d at 1456. In some cases, however, the ALJ can reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor. *E.g., Magallanes v. Bowen,* 881 F.2d 747, 751-55 (9th Cir.1989); *Andrews*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir.1995). For example, in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of Magallanes's treating physicians...." *Magallanes*, 881 F.2d at 752 (emphasis in original). Rather, there was an abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test results, on contrary reports from examining physicians, and on testimony from the claimant that conflicted with her treating physician's opinion. *Id*. at 751-52.

As set forth above, Dr. Goldhamer first testified, "I would not want him to lift anything over ten pounds. I think he can do that occasionally." AR 297. Dr. Goldhamer explained that although he did not have the exact dates of surgery, he believed that Plaintiff was one of a small

percentage of patients who have a "continued weak spot" based on the number of repair surgeries. AR 297-298. At the request of the ALJ, Dr. Goldhamer reviewed records through 2004, which were admitted in his prior application. Dr. Goldhamer stated that his thinking "changes quite a bit" because the last surgery was in April 1998 and Plaintiff has not had any problems since that time. He therefore felt that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently. AR 301-303.

During his credibility assessment, the ALJ explained that although Plaintiff had undergone four hernia surgeries, with the last one in 1998. AR 18. He continued, "As indicated by the medical expert, once the claimant healed from the last surgery, he had no significant residuals except that he was limited from lifting more than 10 pounds frequently and 20 pounds occasionally." AR 18. Plaintiff believes that the ALJ failed to recognize that he *did* have ongoing issues, and therefore erred in crediting the medical expert's second opinion.

In support of his argument, Plaintiff cites a July 18, 2006, document report from Dr. Baker, who treated Plaintiff from February 2003 through April 2004. AR 157-186. The document includes the diagnoses of "other hernia, ventral, without mention of obstruction of gangrene- Status: persistent;" and "abdominal pain, other specified site- Status: chronic, uncontrolled." Dr. Baker ordered a follow-up appointment in one week and a CT scan. AR 270.

It appears from the record that this evidence was submitted to the ALJ, but was not discussed in the decision. Nonetheless, the ALJ's RFC finding was supported by substantial evidence. *See Magallanes,* 881 F.2d at 755 (ALJ need not recite the incantation "I reject the treating physician's opinions because ..." so long as the record reveals specific, legitimate inferences that may be drawn from the ALJ's opinion justifying the decision not to adopt the treating physician's opinion.) Other than Plaintiff's testimony, the rejection of which he does not challenge, there was little evidence in the record suggesting that he had recurrent hernia problems that limited his lifting to the extent he alleges. During his earlier treatment with Dr. Baker, Plaintiff was mainly treated for diabetes, hypertension and hyperlipidemia. AR 157-186. In July 2003, treatment notes indicate that Plaintiff had a slight protrusion to his right mid abdomen, but there were no complaints of pain and no further treatment. AR 168-169.

During Plaintiff's October 2004 consultive examination, he complained of a recurring abdominal ventral hernia and two painful nodules that developed recently along the suture line. AR 238. The nodules were confirmed on examination. AR 240. With this in mind, Dr. Dozier believed that Plaintiff could occasionally lift 20 pounds, 10 pounds frequently. AR 242. Moreover, the State Agency physician, after reviewing the evidence and concluding that Plaintiff suffered from recurrent ventral hernias, opined that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently. AR 252-259. So while the record may have included references to continuing problems with Plaintiff's hernia, the ALJ's RFC, which *did* limit Plaintiff's lifting capabilities, was supported nonetheless. *Tonapetyan v. Halter,* 242 F.3d 1144, 1149 (9th Cir. 2001) (report of consultive examiner may constitute substantial evidence and may serve as an additional specific and legitimate reason for rejecting treating physician's opinion); 20 C.F.R. §§ 404.1513(c) (in assessing RFC, the ALJ may rely upon the state agency physician's findings as to claimant's ability). In other words, the ALJ was entitled to rely on the opinion of the consultive physician over that of the non-examining medical expert.

As to Dr. Baker's one-page document, the document itself provides no assistance in determining Plaintiff's capabilities. Although it indicates that Plaintiff has a recurrent hernia issue, it does not provide any limitations. The mere diagnosis of an impairment is not sufficient to sustain a finding of disability. *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985). Nor is the document supported with related treatment notes. According to the record before the ALJ, Dr. Baker last treated Plaintiff in April 2004, more than two years prior to the July 2006 note.

The Court also notes that even the restrictive opinion of Dr. Paul-Gordon, which will be discussed in further detail below, did not limit Plaintiff to lifting 10 pounds. AR 269, 272.

Even if the ALJ erred by adopting Dr. Goldhamer's second opinion despite notations in the record to Plaintiff's continuing continued hernia complaints, any error was harmless. *See Curry v. Sullivan*, 925 F.2d 1127, 1129 (9th Cir.1990) (failure to articulate or explain weight given to reports of the examining or consultative physicians can be harmless error). The ALJ's decision to adopt Dr. Dozier's opinion was supported by substantial evidence, as explained

below. Moreover, Dr. Goldhamer's original opinion, as that of a non-examining source, was entitled to less weight.

Plaintiff's claim is without merit and should be denied.

B.      Opinion of Dr. Paul-Gordon

Plaintiff next argues that the ALJ incorrectly rejected Dr. Paul-Gordon's functional assessments, which limited Plaintiff to lifting 15 pounds and imposed significant standing limitations. AR 268, 272.

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995). Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 830. Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989). The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).

In *Orn v. Astrue,* 495 F.3d 625 (9th Cir. 2007), the Ninth Circuit reiterated and expounded upon its position regarding the ALJ's acceptance of the opinion an examining physician over that of a treating physician. "When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not '"substantial evidence."'" *Orn,* 495 F.3d at 632; *Murray*, 722 F.2d at 501-502. "By contrast, when an examining physician provides 'independent clinical findings that differ from the findings of the treating physician' such findings are 'substantial evidence.'" *Orn*, 496 F.3d at 632; *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir.1985). Independent clinical findings

can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence, *see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir.1985), or (2) findings based on objective medical tests that the treating physician has not herself considered, *see Andrews*, 53 F.3d at 1041.

If a treating physician's opinion is not giving controlling weight because it is not well supported or because it is inconsistent with other substantial evidence in the record, the ALJ is instructed by Section 404.1527(d)(2) to consider the factors listed in Section 404.1527(d)(2)-(6) in determining what weight to accord the opinion of the treating physician. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. 20 C.F.R. 404.1527(d)(2)(i)-(ii). Other factors include the supportablility of the opinion, consistency with the record as a whole, the specialization of the physician, and the extent to which the physician is familiar with disability programs and evidentiary requirements. 20 C.F.R. § 404.1527(d)(3)-(6). Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is "still entitled to deference." SSR 96-2p; *Orn*, 495 F.3d at 632-633. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p; *Orn*, 495 F.3d at 633.

Here, the ALJ gave little weight to the opinions of Dr. Paul-Gordon because her extreme limitations were unsupported by her own clinical findings and were contradicted by Dr. Dozier, the consultive examiner. AR 20. Indeed, the record does not contain *any* treatment notes from Dr. Paul-Gordon, nor does Plaintiff cite to any. A brief and conclusionary form opinion which lacks supporting clinical findings is a legitimate reason to reject a treating physician's conclusion. *Magallenes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

To the extent that the ALJ adopted the opinion of Dr. Dozier over that of Dr. Paul-Gordon, he was entitled to do so. *Tonapetyan,* 242 F.3d at 1149. The Court is mindful of the recent decision in *Orn v. Astrue,* 495 F.3d 625 (9th Cir. 2007), where the Ninth Circuit reiterated and expounded upon its position regarding the ALJ's acceptance of the opinion an examining

physician over that of a treating physician.  However, where the treating physician's opinion is not supported in the first instance, as here, *Orn v. Astrue* is not instructive.

The ALJ's rejection of Dr. Paul-Gordon's decision was supported by substantial evidence and was free of legal error.

C.     Plaintiff's Foot Impairment

Finally, Plaintiff appears to argue that the ALJ erred in finding his foot impairment non-severe.

An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at step 2 if the medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities).  SSR 85-28.  In determining whether an impairment or combination of impairments is "severe," an ALJ should carefully examine the medical findings that describe the impairments and make an "informed judgment" about the limitations and restrictions the impairment and related symptoms impose on the person's physical and mental ability to do basis work activities.  SSR 96-3p.

In her decision, the ALJ found Plaintiff's gunshot wound to the left toe to be non-severe.  She explained that progress notes showed "steady healing," and that by August 11, 2004, the date of the last progress note from his treating podiatrist, there were no signs of infection and his toe was nearly normal in size.  AR 17.  She further explained that there was no evidence that he sought additional treatment, nor was there evidence of any significant residuals.  AR 17.  When Plaintiff was seen in October 2004, he did not complain of any foot pain and physical examination did not reveal any related symptoms.  AR 17.

The ALJ was correct in her interpretation of the evidence.  In Dr. Malone's August 11, 2004, treatment note, he noted that Plaintiff's toe was almost normal in size and Plaintiff reported that he could move it well without problems, although it was sometimes painful.  AR 232.  Although Dr. Malone indicated further treatment may be necessary if his nerve pain did not

1  improve, there are no records of further treatment.  In fact, when Plaintiff saw Dr. Dozier in

2  October 13, 2004, just two months later, he did not complain of any foot pain.  AR 238.  His gait

3  was normal, his extremities were normal and he did not use an assistive device.  AR 241.  *See*

4  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (an ALJ is entitled to draw inferences

5  logically flowing from the evidence).

6        Contrary to Plaintiff's suggestion, Dr. Malone's July 1, 2004, physical capacities

7  assessment does not change this result.  Dr. Malone opined that Plaintiff's limitations resulting

8  from his gunshot wound, which occurred in March 2004, would last until March 2005.  There is

9  nothing in the record, however, to support any treatment or complaints from August 2004

10  through March 2005.

11        The ALJ's findings were supported by substantial evidence and free of legal error.

## CONCLUSION

13        Based on the foregoing, the Court finds that the ALJ's decision is supported by

14  substantial evidence in the record as a whole and is based on proper legal standards.

15  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the

16  Commissioner of Social Security.  The clerk of this Court is DIRECTED to enter judgment in

17  favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff,

18  Douglas Norwood.

20     IT IS SO ORDERED.

21     Dated:  **August 25, 2008**                    **/s/ Dennis L. Beck**
                                                                  UNITED STATES MAGISTRATE JUDGE